**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

FILED

2014 JAN 10 P 4:00

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| REALBRIGHT INVESTMENTS, INC., )<br><br>Plaintiff, )<br><br>vs. )<br><br>MICHAEL SCHIECK; SUNRAE )<br>ENVIRONMENTAL, INC.; SUNRAE )<br>ENVIRONMENTAL LLC; REALBRIGHT - )<br>SUNRAE AQUAPONICS LLC; and )<br>REALBRIGHT - SUNRAE WATER LLC, )<br><br>Defendants. )<br>_____ ) | Case No.:<br><br>JURY DEMAND<br><br>CA 14- 21 S |

## VERIFIED COMPLAINT

The Plaintiff, Realbright Investments, Inc., hereby alleges as follows:

### PARTIES

1.      The Plaintiff, Realbright Investments, Inc. ("Realbright"), is a Delaware business corporation with a principal place of business located at Estrada de Telheiras, 144-1, 1600-772 Lisbon, Portugal.

2.      Upon information and belief, the Defendant, Michael Schieck, is an individual formerly residing at 103 Dexters Run, in Mount Juliet, Tennessee, currently residing in or near Ottawa, Canada.

3.      The Defendant, SunRae Environmental, Inc. ("SunRae, Inc."), is a defunct Tennessee corporation with a former place of business listed as 103 Dexters Run, Mount Juliet, Tennessee.

4.      The Defendant, SunRae Environmental LLC, ("SunRae, LLC"), is a defunct Tennessee limited liability company with a former place of business listed as 103 Dexters Run, Mount Juliet, Tennessee.

5.      The Defendant, RealBright - SunRae Aquaponics LLC, ("SunRae Aquaponics"), is a Tennessee limited liability company with a former place of business located at 9146 South Highway 341, Chickamauga, Georgia.

6.      The Defendant, Realbright - SunRae Water LLC, ("SunRae Water"), is a defunct Tennessee limited liability company with a former place of business listed as 103 Dexters Run, Mount Juliet, Tennessee.

## JURISDICTION & VENUE

7.      Subject matter jurisdiction exists in the United States District Court pursuant to 28 U.S.C. § 1331 as Realbright's predominant claims arise under the laws of the United States, specifically 18 U.S.C. § 1962(c).

8.      Subject matter jurisdiction exists in the United States District Court pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and complete diversity of citizenship exists among the parties, that is, Realbright is a Delaware business corporation with a principal place of business located in Portugal, whereas the defendants reside in, Tennessee, Georgia and Canada.

9.      Subject matter jurisdiction exists in the United States District Court pursuant to 18 U.S.C. § 1964(c), as Realbright is a juridical person which has been injured by reason of a violation of 18 U.S.C. § 1962, that is, defendants have engaged in interstate commerce and conducted the affairs of SunRae, Inc. SunRae, LLC, SunRae Aquaponics, and SunRae Water through a pattern of racketeering activity, to wit, wire fraud.

10.     Supplemental jurisdiction exists in the United States District Court pursuant to 28 U.S.C. § 1367(a) with respect to Counts II through IX, as said claims are so closely related to Count I as to constitute the same case or controversy.

11.     Personal jurisdiction and venue are proper in the United States District Court for the District of Rhode Island pursuant to 18 U.S.C. § 1965(a) and (b), as the Defendants retained an agent in this district, and pursuant to 28 U.S.C. § 1391(b), because a substantial number of the representations described herein were made in and/or transmitted to Realbright through its Rhode Island agent.

## FACTUAL BACKGROUND

12.     In September of 2011, Realbright contacted Atlantic Leasing Group, Inc., a Rhode Island business corporation ("Atlantic"), to locate investment funding for a photovoltaic plant in California.

13.     In the same time frame, Michael Sokoll, a Rhode Island resident and president of Atlantic, was retained by Michael Schieck as his agent and the agent of SunRae, Inc. to locate and secure investors in SunRae Aquaponics and SunRae Water.

14.     Sokoll introduced Realbright to Schieck in furtherance of his efforts to help Schieck obtain funding for SunRae Aquaponics and SunRae Water.

15.     Schieck and Sokoll presented SunRae, Inc., and the eventual SunRae, LLC, SunRae Aquaponics, and SunRae Water entities (collectively the "SunRae Entities") to Realbright as an investment opportunity and repeatedly pressured Realbright to extend funds to the SunRae Entities.

16.     The SunRae Entities were, in truth, only a means of luring venture capital.

17.     Upon information and belief, Schieck, president of the SunRae Entities, never intended to use the funds provided by Realbright to create self-sustaining, income producing businesses.

18.     Realbright became interested in the SunRae Entities' potential on the basis of Schieck's multiple misrepresentations, including:

a.   That SunRae used "State-of-the-art MSW [municipal solid waste] handling technology . . . along with other technologies including Aquaponics, hydroponics, synergistic algae, and fuel technologies to provide a profitable business enterprise." See App. 4.[*]

b.   "SunRae has signed a 20 year contract with Walker County in Georgia which will generate approximately 280,000 ton of MSW per year." See App. 4.

c.   "The contract provides SunRae a guarantee of $10 per ton from Walker County to process the waste which will in turn generate approximately $30 million dollars per year from the sale of products from the processed MSW." See App. 5.

d.   "We already have buyers committed to buy all of the fish we can produce and willing to buy up to 1M pounds of catfish a week if we could produce it." See App. 38.

e.   That SunRae had assets worth over $300,000 for a water bottling venture. See App. 76-86.

19.     Schieck made misrepresentations to Realbright directly and indirectly through Sokoll with the intention that Sokoll relay the misrepresentations to Realbright.

20.     In October of 2011, members of Realbright's management team visited Schieck in Tennessee, toured available business spaces, and met with the mayor of Pikeville, Tennessee.

21.     On October 17, 2011, Sokoll advised Realbright that SunRae's "projects are hot because the cities want to move now." See App 48.

---

[*] "App." refers to the Appendix attached to the end of this Complaint, paginated App. 1-225.

22.     On November 16, 2011, Schieck sent Realbright and Sokoll the "financials for the aquaponics system," which projected net revenue of $1,234,333 by the end of the first year, and a net profit of $532,953.  See App. 49-50.

23.     On November 21, 2011, Schieck provided the following additional details:

  a.  The company would be a new separate entity;

  b.  Ownership would be 80% SunRae and 20% Realbright;

  c.  "Attaining the 20% of the company will require 10% of the actual cost of equipment already shared with you in the financials."

  d.  "Financing is through Mike [Sokoll] as you know and the money will be used to expedite the process and would allow for having full funding completed for January 1."

  e.  "The funding is a leasing of the equipment so the money you would be putting in would be for setting [sic] the building ready, office, and getting the basic needs for setting the tanks when brought in and for the actual fish and shrimp purchase." See App. 51.

24.     Contemporaneous with the foregoing, Schieck informed Realbright that he had lined up a 20-year contract for a solar power operation in Pikeville, Tennessee and a ten-year contract for a similar operation in Ducktown, Tennessee, but when Realbright expressed interest, Schieck claimed that the project was on hold because the mayor of the town had a botched eye surgery and that he would proceed with the fish farms first because they were "faster money makers." He also claimed to be "working on putting a water bottling company into a community with Steve (the lease guy you know)." See App. 53, 55.

25.     On November 30, 2011, Sokoll requested that Realbright "Please commit to a time to talk with me on Friday about Sun Rae. You told Mike you would have an answer for him by today." See App. 56.

26.     Sokoll represented to Realbright that he had secured funding for the fish farm operation through "Jada" at Atlantic Rim Funding, stating that "[t]his would allow funding by the end of January and you can be growing fish, shrimp and veggies by February and harvesting Shrimp and veggies in June," adding, "[y]ou could even turn a profit for 2012." See App. 57.

27.     In reliance on the foregoing and representations made by Sokoll, on December 19, 2011, Realbright supplied a 10% returnable deposit of $200,000 to Jada so as to allow SunRae, Inc. to obtain a $2,000,000 loan for the new business. See App. 58.

28.     In reliance on the foregoing, on December 20, 2011, Realbright made an initial equity investment of $15,000 in Schieck's "aquaponics" or fish farm venture. See App. 59.

29.     After the holidays, on January 5, 2012, Realbright followed up with Schieck regarding funding from Jada; Schieck replied that the funding had not yet arrived and that his team had spent the holidays completing the design of improved, proprietary "bioreactors" to make the fish farming more profitable. See App. 62.

30.     On January 19, 2012, Schieck told Realbright that he was working on "closing a lease agreement with Sylvania GA, and another one in Millen Ga" for additional fish farms, and attempted to interest Realbright in a municipal solid waste project, claiming that "Jada has already told Mike [Sokoll] she wants to do a MSW with us and approved a loan for 19M previously for us on a project like this one." See App. 61.

31.     After Realbright declined the solid waste proposal, on January 30, 2012, Sokoll forwarded to Realbright an email from Schieck containing a water bottling proposal in which he included financials and additional details, specifically that the city of Ducktown had agreed to invest $200,000, comprised of an initial $50,000 deposit and monthly payments on the bottling equipment for the three year lease term. Sokoll and Schieck also represented that the city would lease the land for the facility for one dollar and turn it over to the bottling company at the end of

the three year equipment financing term.  The email from Schieck to Sokoll is signed "Mike Sokoll, for Sun Rae."  See App. 63-67.

32.     The email concluded with the following exhortation:

> Ducktown is ready to put in the $50k deposit by March 1st and begin the payments for the water bottling equipment. Please consider this information as part of the offer to be part of Sun Rae's growth. This message has some clarification added from Mike's message. Your attention to this soon would is [sic] important. We know you have been waiting for this to come.

See App. 64.

33.     Upon information and belief, various correspondence from Sokoll to Realbright was actually drafted by Schieck, sent to Sokoll with directions to copy and paste into a new email to Realbright so that it would appear that Sokoll drafted the correspondence himself.

34.     On February 24, 2012, Sokoll forwarded a Schieck presentation of a business plan dated February 20, 2012, for the water bottling operation and photos of the equipment already owned and in storage, see App. 69, claiming:

> The need is for the 200,000 for the building on the land. All of the rest of this project is complete and ready to start construction. This will enable you to own 20% of the water bottling company and first rights to be asked to joint venture on the other projects.

See App. 87.

35.     On March 19 and 29, 2012, Realbright and SunRae, Inc., an entity later superseded by SunRae, LLC pursuant to amendments dated November 10, 2012, signed joint venture agreements regarding the aquaponics (the "Aquaponics Joint Venture Agreement") and water bottling (the "Water Joint Venture Agreement") ventures.  See App. 89-104.

36.     On April 3, 2012, pursuant to the Water Joint Venture Agreement, Realbright transferred $100,000 to SunRae, and shortly thereafter, Schieck formed SunRae Aquaponics and SunRae Water.  See App. 105.

37.     On April 17, 2012, Sokoll advised Realbright that funding was "only a few days away." See App. 106.

38.     Contrary to the express terms of the Water Joint Venture Agreement, Schieck unilaterally relocated the water bottling project to a facility in Chicamauga, Georgia, pursuant to a lease in the amount of $48,000 per year rather than the one dollar per year allegedly promised by the City of Ducktown.  Schieck advised Realbright that he moved the equipment to the new location; however, to date, Schieck has never provided copies of the equipment lease or financial information despite repeated requests.

39.     Though Schieck claimed a series of setbacks caused by others, he continued to make misrepresentations regarding contracts for fish and future profits, and induced Realbright to trust him by repeatedly asserting "I deliver" and "i hold my word."  See, e.g., App. 118, 119, 153.

40.     On April 17, 2012, Sokoll advised the parties that Jada was in the ER with Crones Disease.  See App. 107.

41.     On May 25, 2012, Sokoll provided another update claiming that some people were "playing around with the money," but that the problem had now been resolved, and that "now we only have the holiday Monday in our way for the funding to happen."  See App. 116.

42.     On June 1, 2012, Sokoll advised Realbright that that he had heard that Realbright was attempting to have its $200,000 deposit returned, claimed that Schieck was "in a dilemma," that he had another source for funding, and asked if there was anything Realbright could do to help Schieck continue.  See App. 117.

43.     The next day, on June 2, 2012, Schieck claimed that the fish farm was at risk because Jada had not provided funding yet; he asked for money to be advanced to avoid the risk of the project dying and to capture a contract for yellow perch with a "fish network that would buy all the fish we could grow."  He claimed this would generate a profit of "$750,000-$800,000 per harvest," with 2-3 harvests per year.  See App. 118.

44.     On June 8, 2012, pursuant to Schieck's and Sokoll's pleas and the Aquaponics Joint Venture Agreement, Realbright released to SunRae Aquaponics $200,000 that previously had been held in escrow during Jada's analysis of the project.   See App. 122.

45.     On June 20 and 21, 2012, Sokoll advised the parities that the need for additional signatures was delaying the funding from Jada and that "the funds are in some accounts but cannot be used until all the paperwork is in order due to banking and federal rules/regulations/technicalities." See App. 124-25.

46.     On June 28, 2012, Sokoll advised Realbright that another client of his expected funding in 24-48 hours from Jada, so SunRae's funding would also be coming soon. See. App. 126.

47.     On July 12, 2012, Sokoll forwarded an email from Jada purporting "really think we are FINALLY there." See App. 127.

48.     Despite the forgoing, the funding still did not arrive from Jada, and Sokoll proposed alternative funding sources, but Realbright suspected these to be fraudulent or unreliable.

49.     On August 3, 2012, Sokoll emailed Realbright stating, "Let me explain the present need to keep the project moving to become self sustaining." He claimed that "a small investment now could actually make the project debt free through organic growth," and that this could get the business to "cash flow in less than 90 days." See App. 130.

50.     A few days later, on August 10, 2012, Sokoll turned up the pressure on Realbright, stating, "Let me be 100% clear; you are about to lose your entire $300,000 investment if you do not act very fast." See App. 132.

51.     The next day, on August 11, 2012, Schieck emailed Realbright that, though the possibility of funding from Jada was still on the table, he would have "no choice but to close the businesses without having an influx of funds from you." See App. 133.

52.     On August 14, 2012, Sokoll told Realbright regarding the fish farm:

> The project is between 60-70% complete.  It will only take a small amount to push it to production and then to cash flow.  However, no action will cause the project to close and the $300,000 may be lost . . . only by the grace of God is Mike not shutdown right now.

See App. 136.

53.    On August 20, 2012, in email to Realbright and copied to Sokoll, Schieck requested a $250,000 influx of cash from Realbright, claiming that it would pay wages and rents for six months, allow the fish to grow to market size, and thus permit the business to become self-sufficient, but otherwise, the business would close.  Sokoll, in an email response to all of the recipients, stated that, "This is a clear statement of the facts from Mike.  We need a conversation about this ASAP."  See App. 137.

54.    In response to this latest request for more funds, Realbright requested information as to how funds had been and would be used, and sought extra assurances and insurance; however, Sokoll claimed that Schieck was travelling and could not promptly respond.  See App. 139-40.

55.    On August 28, 2012, Sokoll claimed that it would not be possible for Schieck to provide the requested assurances and insurance for reasons beyond Schieck's control, that "there are only a couple of weeks before it is TOO late to get fish in the tanks," but that the project was close to cash flow.  He further asked Realbright "to consider the amount of work accomplished by Mike's team, many of whom worked for free only shares in the business from Mike's shares." As for the water bottling operation, Sokoll now claimed for the first time that government approvals were lacking.  See App. 142.

56.    At the insistence of Schieck and Sokoll, after coming to the United States to tour the facility, Realbright reluctantly agreed to provide an additional $250,000 of funding to continue operations until Jada could come through or Sokoll located an additional source of funds.  No third-party funding source, however, was ever found and all funding was through Realbright.

57.    In reliance on the foregoing, in the late summer and fall of 2012, Realbright agreed to lend SunRae Aquaponics an additional $250,000, which was to be provided in two $125,000

tranches, and executed amendments to both joint venture agreements (the "Water Joint Venture Amendment" and "Aquaponics Joint Venture Amendment"). See App. 158-70. Realbright delivered the first tranche on September 28, 2012. See App. 149.

58.    In connection with the additional funds, Realbright requested documentation as to how previous funds were spent and how the new funds would be spent, but Schieck again insisted that he could not provide the documentation in advance because of the lack of time before he would exhaust all funds and have to close, promising nonetheless that the documentation would quickly follow after his receipt of the new funds.

59.    Because the documentation did not follow as promised, Realbright began to insist that Schieck provide the missing documentation. Schieck, however, stated that he did not know what documents were needed, claimed that the "work being done is not so physically noticeable," and said that he urgently needed the second $125,000 tranche or would be forced to close. See App. 152, 155-56, 175-83.

60.    On November 9, 2012, Sokoll emailed Realbright stating that the second tranche "will allow everything to continue," but that a "delay could cause a third and final shutdown." He further stated, "I see plain logic in what he [Mike] is doing. There should be fish very soon and a harvest and profits in only a few months to follow." See App. 157.

61.    On November 21, 2012, in reliance on Schieck's and Sokoll's representations, Realbright supplied the second $125,000 tranche. See App. 172.

62.    In the months that followed, Realbright requested information, updates and the promised assurances from Schieck, but to date, Schieck has neglected to provide any of these.

63.    After Realbright's repeated requests for financials, Schieck claimed on February 21, 2013 that he was again out of funds, and would have to close in three weeks without an immediate influx of cash. See App. 181. He claimed on March 6, 2013, "We need those funds for the USA within a week or it is dead . . . ." See App. 183.

64.     Though Schieck claimed that he needed $150,000 to keep operating, the figures he provided justified only $66,150. Once Realbright so advised Schieck, Schieck changed his costs and expenses to justify the larger figure. See App. 184, 188.

65.     In spring of 2013, Realbright suspected that Schieck used a portion of its funds to acquire a public Canadian company named Golden Moor Inc. ("Golden Moor"), a Canadian purveyor of pain-relieving mud products; though he first denied this, Schieck ultimately admitted to using Realbright's funds for the purchase during a visit by representatives of Realbright to Golden Moor, in Canada in June of 2013.

66.     In early February, Schieck had asked Realbright if it would be interested in acquiring 5% of Golden Moor; Realbright replied that it was not interested because its concern and commitment was to complete the aquaponics project and, after this, go with the water bottling project. It was with this rejection that Schieck claimed that he needed the additional $150,000. In return for the additional $150,000, he promised to transfer 5% of Golden Moor stock to Realbright and to give it a seat on the Golden Moor board.

67.     Though it declined Schieck's invitation to invest in Golden Moor, Realbright ultimately provided the $150,000 in additional funding to SunRae Aquaponics pursuant to a Shares Purchase and Sale Agreement dated of March 21, 2013 (the "Share Purchase and Sale Agreement)" for 5,129,452 shares of Golden Moor stock owned by SunRae, LLC (the "Shares"). See App. 197-201.

68.     In addition, Schieck and Realbright executed a collateral loan agreement and a promissory note (the "Collateral Loan Agreement"), regarding the $350,000 already loaned by Realbright, which were guaranteed by SunRae, LLC and secured by 11,666,667 shares of Golden Moor stock owned by SunRae, LLC (the "Collateral"). See App. 189-96.

69.     Despite numerous requests, Realbright has yet to receive the Shares as promised pursuant to the terms of the Shares Purchase and Sale Agreement or the Collateral promised pursuant to the terms of the Collateral Loan Agreement.

70.     In all, in spite of receiving $715,000 from Realbright, the SunRae Entities have not sold a single fish or bottle of water.

71.     On October 24, 2013, Realbright issued Schieck a last written demand to inspect the books and records of SunRae Aquaponics and SunRae Water, to deliver the Shares and the Collateral, and to agree to terminate the Chicamauga, Georgia facility lease agreement and move the equipment therein to appropriate storage, but Schieck failed to comply once again.  See App. 223-25.

72.     In addition to the foregoing, Realbright has disbursed $25,000 in rent payments for the months of August through December of 2013 for the Chicamauga, Georgia facility.

73.     To date, Realbright has made payments totaling $740,000 in regard to the SunRae Aquaponics and SunRae Water projects.

## COUNT I
### Racketeering, 18 U.S.C. § 1962(c)

74.     Realbright re-avers paragraphs 1-73 as if fully set forth in this count.

75.     The SunRae Entities are each an "enterprise" within the meaning of 18 U.S.C. § 1961(4) as they are registered Tennessee limited liability companies.

76.     The SunRae Entities, though their activities, have affected interstate commerce.

77.     Schieck is a "person" within the meaning of 18 U.S.C. § 1961(3) as he is an individual capable of holding a legal or beneficial interest in property.

78.     Schieck was an agent of the SunRae Entities at all times relevant hereto.

79.     Schieck participated in the conduct of the SunRae Entities' affairs through a pattern of racketeering activity, to wit, wire fraud as more fully described above.

80.    The SunRae Entities, and Schieck are jointly and severally liable for Realbright's loss.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the Defendants, Michael Schieck, SunRae Environmental, Inc., SunRae Environmental LLC, RealBright - SunRae Aquaponics LLC, and Realbright - SunRae Water LLC, in the amount of three times its actual damages of $740,000, plus accruing interest, attorneys' fees and costs.

## COUNT II
*Deceit*

81.    Realbright re-avers paragraphs 1-80 as if fully set forth in this count.

82.    Schieck made false statements to representatives of Realbright directly and through Sokoll on behalf of and regarding SunRae, Inc., SunRae, LLC, SunRae Aquaponics, and SunRae Water.

83.    Schieck knew these statements to be false.

84.    Schieck made the aforesaid statements so as to deceive Realbright.

85.    Schieck intended for Realbright to rely on these statements.

86.    Schieck made the aforesaid statements so as to induce Realbright to advance funds to SunRae, Inc., SunRae, LLC, SunRae Aquaponics, and SunRae Water.

87.    Realbright has lost $740,000 as a result of its reliance on the statements of Schieck.

88.    Schieck is liable for Realbright's loss.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the Defendant, Michael Schieck, SunRae Environmental, Inc., SunRae Environmental LLC, RealBright - SunRae Aquaponics LLC, and Realbright - SunRae Water LLC, in the amount of $740,000, plus accruing interest, attorneys' fees and costs.

## COUNT III

*Injunctive Relief & Accounting*

89.     Realbright re-avers paragraphs 1-88 as if fully set forth in this count.

90.     Realbright is a shareholder of SunRae Aquaponics and SunRae Water, and is a creditor of SunRae, Inc., SunRae, LLC and SunRae Aquaponics.

91.     On October 24, 2013, Realbright presented a final demand in writing to Schieck for access to inspect and copy the corporate books and records of SunRae Aquaponics, SunRae Water and Golden Moor, and for delivery of the Shares and the Collateral, but Schieck has failed to comply.

92.     Schieck's failure to comply with Realbright's October 24, 2013 demand constitutes a refusal on the part of an officer or agent, and on the part of the companies, to permit examination of books and records of account, minutes, and records of shareholders, for a proper purpose.

93.     Schieck's failure to provide the Shares and the Collateral constitutes irreparable harm to Realbright and a breach of the Shares Purchase and Sale Agreement and of the Collateral Loan Agreement.

94.     The insolvency or inability of Schieck, SunRae, Inc., SunRae, LLC, SunRae Aquaponics, and SunRae Water to satisfy an eventual judgment in favor of Realbright poses irreparable harm to Realbright.

95.     The irreparable harm posed by Schieck's failure to deliver the Shares and the Collateral is actual, and the defendants' potential insolvency is presently threatened and imminent insofar as SunRae, Inc., SunRae, LLC, and SunRae Water are presently in revoked status, SunRae Aquaponics is not operating, and Schieck has denied Realbright access to their books and records.

96.     No legal remedy exists to restore Realbright to its rightful position as a creditor or shareholder should Schieck further encumber or transfer the assets or shares of SunRae Aquaponics, SunRae Water, or Golden Moor.

97.     The balance of the equities favors entry of injunctive relief on behalf of Realbright.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., requests that this Court grant it relief in the form of: (1) an order of this Court compelling Michael Schieck, pursuant to Tenn. Code Ann. § 48-26-102, to produce the books and records of RealBright - SunRae Aquaponics LLC and Realbright - SunRae Water LLC for examination and inspection; (2) enjoin Michael Schieck, SunRae Environmental, Inc., SunRae Environmental LLC, RealBright - SunRae Aquaponics LLC, and Realbright - SunRae Water LLC from encumbering or transferring assets or shares of RealBright - SunRae Aquaponics LLC and Realbright - SunRae Water LLC, or Golden Moor Inc.; and (3) deliver to Realbright Investments, Inc. the Shares and the Collateral promised pursuant to the Shares Purchase and Sale Agreement and the Collateral Loan Agreement.

## COUNT IV
### *Fraudulent Inducement – Breach of Contract*
### *Water Joint Venture Agreement*

98.     Realbright re-avers paragraphs 1-97 as if fully set forth in this count.

99.     The Water Joint Venture Agreement constitutes a contract between Realbright and SunRae, Inc.

100.    Realbright released $100,000 to SunRae, Inc. pursuant to the Water Joint Venture Agreement.

101.    In order to procure the Water Joint Venture Agreement, SunRae, Inc. submitted false "financials" and made material misrepresentations through Schieck and Sokoll to Realbright

concerning its assets, the City of Ducktown, its past and ongoing relationship with the City of Ducktown, and the willingness of the City of Ducktown to participate in a partnership.

102.   Realbright entered the Water Joint Venture Agreement and released $100,000 to SunRae, Inc. in reasonable reliance on the aforesaid material misrepresentations.

103.   SunRae, Inc. breached the Water Joint Venture Agreement by:

     a. Failing to apply the $100,000 for its intended corporate purposes;

     b. Unilaterally relocating the water bottling project to a facility in Chicamauga, Georgia and entering a lease in the amount of $48,000 per year, rather than the one dollar per year allegedly promised by the City of Ducktown; and

     c. Withholding from Realbright information concerning operational and financial activities.

104.   Schieck was the sole stockholder of SunRae, Inc., as well as its president and treasurer, and only he knew of that entity's financial dealings and machinations.

105.   Schieck failed to capitalize SunRae, Inc., and had broad, general authority that he used to misappropriate corporate funds for his personal, non-corporate purposes.

106.   Upon information and belief, SunRae, Inc. had no purpose other than to facilitate and protect Schieck's fraud.

107.   Realbright has incurred damages in excess of $125,000 for its lost investment and ongoing rental payments made under the Chicamauga lease.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the Defendant, SunRae Environmental, Inc. and Michael Schieck, in the amount of $125,000, plus accruing interest, attorneys' fees and costs.

## COUNT V

*Fraudulent Inducement – Breach of Contract*
*Water Joint Venture Amendment*

108.    Realbright re-avers paragraphs 1-107 as if fully set forth in this count.

109.    The Water Joint Venture Amendment constitutes a contract between Realbright and SunRae, LLC.

110.    In order to procure the Water Joint Venture Amendment, SunRae, LLC made material misrepresentations through Schieck and Sokoll to Realbright concerning the City of Ducktown's failure to keep alleged commitments, including the failure to clear trees and provide infrastructure, the availability of mountain spring water in LaFayette, Georgia, and the venture's readiness to begin bottling water in two months.

111.    Realbright entered the Water Joint Venture Amendment and proceeded with the joint venture with SunRae, LLC in reasonable reliance on the material misrepresentations referenced in Count IV above as well as those referenced in this Count.

112.    SunRae, LLC is a mere continuation of SunRae, Inc. insofar as it obtained all of the latter's assets for less than adequate consideration, continued the business of SunRae, Inc., and is directed by Schieck just as SunRae, Inc. was.

113.    SunRae, LLC breached the Water Joint Venture Amendment by:

    a.    Failing to apply Realbright's $100,000 investment for its intended corporate purposes; and

    b.    Withholding from Realbright information concerning operational and financial activities.

114.    Schieck was the sole member of SunRae, LLC, as well as its president and treasurer, and only he knew of that entity's financial dealings and machinations.

115.    Schieck failed to capitalize SunRae, LLC, and had broad, general authority that he used to misappropriate corporate funds for his personal, non-corporate purposes, to wit, fraud.

116.    Upon information and belief, SunRae, LLC had no purpose other than to perpetuate and protect Schieck's fraud.

117.    Realbright incurred damages in excess of $125,000 for its lost investment and ongoing rental payments made under the lease.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the Defendant, SunRae Environmental, LLC and Michael Schieck, in the amount of $125,000, plus accruing interest, attorneys' fees and costs.

## COUNT VI
*Fraudulent Inducement – Breach of Contract*
*Aquaponics Joint Venture Agreement*

118.    Realbright re-avers paragraphs 1-117 as if fully set forth in this count.

119.    The Aquaponics Joint Venture Agreement constitutes a contract between Realbright and SunRae, Inc.

120.    Realbright released $115,000 to SunRae, Inc. pursuant to the Aquaponics Joint Venture Agreement.

121.    In order to procure the Aquaponics Joint Venture Agreement, SunRae, Inc. submitted false "financials" and made material misrepresentations through Schieck and Sokoll to Realbright stating that it had secured funding, had designed new and improved proprietary "bioreactors" to make the fish farming more profitable, and that it was working on "closing a lease agreement with Sylvania GA, and another one in Millen Ga" for additional fish farms.

122.    Realbright entered the Aquaponics Joint Venture Agreement and released $115,000 to SunRae, Inc. in reasonable reliance on the aforesaid material misrepresentations.

123.    SunRae, Inc. breached the Aquaponics Joint Venture Agreement by:

    a.  Failing to apply the $115,000 for its intended corporate purposes; and

    b.  Withholding from Realbright information concerning operational and financial

        activities.

124.    Schieck was the sole stockholder of SunRae, Inc., as well as its president and treasurer,

and only he knew of that entity's financial dealings and machinations.

125.    Schieck failed to capitalize SunRae, Inc., and had broad, general authority that he used to

misappropriate corporate funds for his personal, non-corporate purposes.

126.    Upon information and belief, SunRae, Inc. had no purpose other than to facilitate and

protect Schieck's fraud.

127.    Realbright has incurred damages in excess of $140,000 for its lost investment and

ongoing rental payments made under the Chicamauga lease.

    WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the

Defendant, SunRae Environmental, Inc. and Michael Schieck, in the amount of $140,000, plus

accruing interest, attorneys' fees and costs.

### COUNT VII

*Fraudulent Inducement – Breach of Contract*
*Aquaponics Joint Venture Amendment*

128.    Realbright re-avers paragraphs 1-127 as if fully set forth in this count.

129.    The Aquaponics Joint Venture Amendment constitutes a contract between Realbright and

SunRae, LLC.

130.    In order to procure the Aquaponics Joint Venture Amendment, SunRae, LLC made

material misrepresentations through Schieck and Sokoll to Realbright claiming that it had

secured lucrative contracts and stating that the project was between 60-70% complete and would only take a small amount to push it to production and then to cash flow.

131.    Realbright entered the Aquaponics Joint Venture Amendment and proceeded with the joint venture with SunRae, LLC in reasonable reliance on the material misrepresentations referenced in Count VI above as well as those referenced in this Count.

132.    SunRae, LLC is a mere continuation of SunRae, Inc. insofar as it obtained all of the latter's assets for less than adequate consideration, continued the business of SunRae, Inc., and is directed by Schieck just as SunRae, Inc. was.

133.    SunRae, LLC breached the Aquaponics Joint Venture Amendment by:

> a.    Failing to apply Realbright's $115,000 investment for its intended corporate purposes; and
>
> b.    Withholding from Realbright information concerning operational and financial activities.

134.    Schieck was the sole member of SunRae, LLC, as well as its president and treasurer, and only he knew of that entity's financial dealings and machinations.

135.    Schieck failed to capitalize SunRae, LLC, and had broad, general authority that he used to misappropriate corporate funds for his personal, non-corporate purposes, to wit, fraud.

136.    Upon information and belief, SunRae, LLC had no purpose other than to perpetuate and protect Schieck's fraud.

137.    Realbright incurred damages in excess of $140,000 for its lost investment and ongoing rental payments made under the lease.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the Defendant, SunRae Environmental, LLC and Michael Schieck, in the amount of $140,000, plus accruing interest, attorneys' fees and costs.

## COUNT VIII
*Fraudulent Inducement – Breach of Contract*
*Share Purchase and Sale Agreement*

138.    Realbright re-avers paragraphs 1-137 as if fully set forth in this count.

139.    The Share Purchase and Sale Agreement constitutes a contract between Realbright and SunRae, LLC.

140.    In order to procure the Share Purchase and Sale Agreement, SunRae, LLC made material misrepresentations through Schieck and Sokoll to Realbright stating that "the project is moving along great" but that "We need those funds for the USA within a week or it is dead from the finance side of it."

141.    Realbright entered the Share Purchase and Sale Agreement and released $150,000 to SunRae, LLC in reasonable reliance on the multiple material misrepresentations referenced herein.

142.    SunRae, LLC breached the Share Purchase and Sale Agreement by failing to deliver 5,129,452 shares of Golden Moor stock owned by SunRae, LLC.

143.    Realbright incurred damages in excess of $150,000.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the Defendants, SunRae Environmental, LLC and Michael Schieck, in the amount of $150,000, plus accruing interest, attorneys' fees and costs.

## COUNT IX
*Fraudulent Inducement – Breach of Contract*
*Collateral Loan Agreement*

144.   Realbright re-avers paragraphs 1-143 as if fully set forth in this count.

145.   The Collateral Loan Agreement constitutes a contract between Realbright and SunRae, LLC.

146.   In order to procure the Collateral Loan Agreement, SunRae, LLC made material misrepresentations through Schieck to Realbright stating that it was not "insolvent, bankrupt, or contemplating bankruptcy"

147.   Realbright entered the Collateral Loan Agreement and released $350,000 to SunRae, LLC in reasonable reliance on the multiple material misrepresentations referenced herein.

148.   SunRae, LLC breached the Collateral Loan Agreement by failing to deliver the 11,666,667 shares of Golden Moor stock owned by SunRae, LLC.

149.   Realbright incurred damages in excess of $350,000.

WHEREFORE, the Plaintiff, Realbright Investments, Inc., demands judgment against the Defendants, SunRae Environmental, LLC and Michael Schieck, in the amount of $350,000, plus accruing interest, attorneys' fees and costs.

## VERIFICATION
*Pursuant to 28 USC § 1746*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on:

_____
Emanuel de Sousa, Board Director
RealBright Investments, Inc.

## JURY DEMAND

The Plaintiff, Realbright Investments, Inc., demands a trial by jury on all issues so triable.

Date:  January 10, 2014

The Plaintiff, Realbright Investments, Inc.,
By its Attorneys,

J. Richard Ratcliffe, #2603
Jeffrey Biolchini, # 7320
Ratcliffe Harten Burke & Galamaga, LLP
40 Westminster Street, Suite 700
Providence, R.I. 02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhbglaw.com
jbiolchini@rhbglaw.com